## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

LYDIA J. BUCKLEY,

       Claimant,

vs.

ANDREW M. SAUL,

Commissioner of Social Security,[1]

       Defendant.

No. 18-CV-4070-CJW

**REPORT AND RECOMMENDATION**

_____

     This is a cessation of benefits case involving an application for disability insurance benefits under Titles II and XVIII of the Social Security Act, 42 U.S.C. Sections 401-34 and 1391-1395 and for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-1383. Plaintiff, Lydia J. Buckley ("Claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for continuation of benefits. The ALJ stated that her opinion to deny continuation of benefits was only related to continuation of Claimant's childhood disability benefits and that she addressed Claimant's continuation of disability insurance benefits and SSI in a separate opinion. (AR[2] at 39.) The parties seem agree that there is no separate opinion.[3] (Doc. 12 at 2.) Claimant

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] AR cites refer to pages in the Administrative Record.

[3] Although the parties stipulate to this (Doc. 12 at 2), in his brief, the Commissioner states that the ALJ addressed Claimant's claims for adult disability benefits and SSI benefits in a different decision. (Doc. 14 at 2) (citing AR at 39).

1

contends that the Administrative Law Judge ("ALJ") erred in determining that she was not still disabled under the Social Security Act. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I.      BACKGROUND

I adopt most of the facts set forth in the Parties' Joint Statement of Facts (Doc. 12) and summarize the pertinent facts here. When relevant, I will explain where I do not adopt the Joint Statement of Facts. Claimant was born on May 14, 1990 (AR at 257.) Claimant is a high school graduate and attended college for two years, but did not graduate. (*Id.* at 62, 104-05.) As a minor, she received disability benefits based on her father's disability application. (*Id.* at 39.) Benefits terminated when she turned 18 in 2008, but were reinstated after she filed for benefits in 2011 as the disabled adult child of a wage earner. (*Id.*) On March 19, 2013, an ALJ found Claimant had the following severe impairments: "intracranial hypertension secondary to intracranial sinus thrombosis, partial visual field loss secondary to intracranial hypertension, obesity, papilledema, polycystic ovarian disease, . . . cerebral anxiety disorder, a major depressive disorder recurrent, a mood disorder secondary to general medical condition, and attention deficit hyperactivity disorder." (*Id.* at 171.) At the December 19, 2012 hearing related to that claim, a vocational expert testified that no jobs existed for a person of Claimant's age, education, work experience, and residual functional capacity ("RFC"). (*Id.* at 173.)

On March 19, 2013, an ALJ found Claimant disabled and unable to work as of May 13, 2008 due to excessive work absences. (*Id.* at 172-74.) This is the comparison point decision ("CPD"). (*Id.* at 41.) At that time, the ALJ noted, "Medical improvement is expected with appropriate treatment. Consequently, a continuing disability review is recommended in 24 months." (*Id.* at 174.)

On August 10, 2016, the Social Security Administration ("SSA") notified Claimant that her benefits would terminate on October 31, 2016 because it had determined she was no longer disabled. (*Id.* at 175.) Claimant appealed that decision and a state agency disability hearing officer conducted a hearing on December 15, 2016 and again found her not disabled. (*Id.* at 199-204.) Claimant appealed that decision and requested a hearing before an ALJ. (*Id.* at 208.)

A video hearing was held before an ALJ on June 13, 2017 with ALJ Jan E. Dutton and Vocational Expert ("VE") Stephen Schill in Omaha, Nebraska and Claimant and her attorney, Wil L. Forker, in Sioux City, Iowa. (*Id.* at 54-86.) Claimant and VE Schill both testified. (*Id.* at 61-85.) ALJ Dutton entered a decision unfavorable to Claimant on November 13, 2017. (*Id.* at 39-48.) Claimant filed a request for the Appeals Council to review the decision and evaluate additional evidence from 2011 and 2018. (*Id.* at 2.) On July 10, 2018, the Appeals Council determined the 2011 evidence would not have changed the outcome of the ALJ's decision and the 2018 evidence did not relate to the relevant time. (*Id.*) The Appeals Council also found there was no basis to review the ALJ's decision (*Id.* at 1.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Thus, the time period relevant to this appeal is from March 19, 2013 (the CPD date) to the date of the Commissioner's final decision, November 13, 2017. (*Id.* at 39.)

On August 27, 2018, Claimant timely filed her complaint in this Court. (Doc. 4.) All briefs were filed by March 5, 2019. (Doc. 16.) On March 5, 2019, the Honorable Charles J. Williams, United States District Court Judge, referred the case to me for a Report and Recommendation.

## II. DISABILITY DETERMINATIONS IN MEDICAL IMPROVEMENT CASES

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

> The claimant in a disability benefits case has a "continuing burden" to demonstrate that he is disabled, *Mathews v. Eldridge,* 424 U.S. 319, 336, 96 S. Ct. 893, 903, 47 L. Ed.2d 18 (1976), and no inference is to be drawn from the fact that the individual has previously been granted benefits. 42 U.S.C. § 423(f). Once the claimant meets this initial responsibility, however, the burden shifts to the Secretary to demonstrate that the claimant is not disabled. *Lewis v. Heckler,* 808 F.2d 1293, 1297 (8th Cir.1987). If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work. 20 C.F.R. § 404.1594(b)(2)-(5).

*Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991); *Brady v. Berryhill*, No. 4:16CV1173 ACL, 2017 WL 4099483, at *3 (E.D. Mo. Sept. 15, 2017). To determine

if a claimant has a continuing disability, ALJs employ the sequential analysis prescribed in 20 C.F.R. § 404.1594(f).

(1) whether the claimant is currently engaging in substantial gainful activity;

(2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment;

(3) whether there has been a medical improvement;

(4) if there has been medical improvement, whether it is related to the claimant's ability to work;

(5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies;

(6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe;

(7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity; and

(8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

*Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003) (citing 20 C.F.R. § 404.1594(f)).

"Substantial activity [at step one] is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996)). If the claimant is performing substantial gainful activity, the claimant's disability has ended. 20 C.F.R. § 404.1594(f)(1).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments meet or equal the severity of a listed impairment. *Id*. at § 404.1594(f)(2). If the claimant's impairment or combination of impairments meet or medically equal a listed impairment, the claimant's disability continues. *Id*.

5

At step three, the ALJ will determine if there has been medical improvement in the claimant's condition since the CPD. *See Greifzu-Hamric v. Berryhill*, No. 4:16-CV-0177-NCC, 2017 WL 1164857, at *1 (E.D. Mo. Mar. 29, 2017), *aff'd*, 733 F. App'x 337 (8th Cir. 2018). Medical improvement is

> any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the [CPD]. . . . A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s).

*Delph v. Astrue*, 538 F.3d 940, 947 (8th Cir. 2008) (quoting 20 C.F.R. § 416(b)(1)(i)); 20 C.F.R. § 20 C.F.R. §404.1594(f)). If medical improvement has occurred, the analysis proceeds to step four. 20 C.F.R. § 404.1594(f)(3). If not, the analysis proceeds to step five. *Id.*

At step four, the ALJ assesses whether the claimant's medical improvement is related to the ability to do work, specifically whether the medical improvement has resulted in an increase in the claimant's ability to do basic work activities since the CPD. 20 C.F.R. § 404.1594(f)(4). If so, the analysis proceeds to step six; if not, the analysis proceeds to step five. *Id.*

If the ALJ found at step three that there was no medical improvement or at step four that the medical improvement was not related to the claimant's ability to work, the ALJ will consider whether any exceptions apply.[4] 20 C.F.R. § 404.1594(f)(5). If none apply, the claimant's disability continues. *Id.* If one of the first group of exceptions applies, the analysis moves to step six. *Id.* If an exception from the second group applies, the claimant's disability ends. *Id.*

---

[4] Exceptions are found in 20 C.F.R. § 404.1594(d),(e).

At step six, the ALJ will determine if the claimant's current impairments are severe. *Id.* at § 404.1594(f)(6). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant's disability ends and the analysis proceeds to the next step. *Id.* The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quotation omitted) (numbers added; internal brackets omitted).

At step seven, the ALJ determines if the claimant's current RFC will not allow the claimant to perform past relevant work. § 404.1594(f)(7). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his or her application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1).

If the claimant can perform past relevant work, the claimant's disability ends. *Id.* § 404.1594(f)(7). If not, the analysis moves to the final step. *Id.* At step eight, the Commissioner has the burden to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* § 404.1594(f)(8). The ALJ

must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

The ALJ made the following findings regarding Claimant's disability status. The ALJ found that Claimant's CPD date was March 19, 2013, the date of the most recent favorable medical decision that found Claimant was disabled.  (AR at 41.)  The ALJ also found that at the time of the CPD, Claimant had the following  medically determinable impairments:

> intracranial hypertension secondary to intracranial sinus thrombosis, partial visual field loss secondary to intracranial hypertension, obesity, papilledema, polycystic ovarian disease, and a cerebral pseudotumor. She also had an anxiety disorder, a major depressive disorder, recurrent, a mood disorder, and Attention Deficit Hyperactivity Disorder.

(*Id.*)  These impairments were found to result in the following RFC:

> [the ability] to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk, for six out of eight hours, and sit for six hours in an eight-hour workday, push and pull within these limitations, occasionally climb, balance, stoop, kneel, crouch and crawl, avoid hazards such as ladders, ropes, or scaffolds and unprotected heights, pay attention for up to two hours, but must then take a break and the claimant would be absent from work two or three days per month.

(*Id.*) The ALJ then made the following findings as to the current eight-step evaluation process.

At step one, the ALJ found that through October 31, 2016, the date the SSA found that Claimant's disability ended, Claimant did not engage in substantial gainful activity. (*Id.*)

At step two, the ALJ found that the current medical evidence established that Claimant did not develop any additional impairments from the date of the CPD until

October 31, 2016. (*Id.*) In addition, the ALJ found that since October 31, 2016, Claimant did not have an impairment or combination of impairments that met or medically-equaled the severity of an impairment in the listings. (*Id.*)

At step three, the ALJ found that medical improvement occurred as of October 31, 2016. (*Id.* at 41-43.) This finding is at issue between the parties and forms the basis of their arguments.

At step four, the ALJ found that Claimant's medical improvement was related to the ability to work because the improvement resulted in an increase in the Claimant's RFC. (*Id.* at 46.)

The ALJ did not discuss the step five exceptions. An exception does not apply in this case. *See* 20 C.F.R. §§ 404.1594(d),(e) (listing the exceptions).

At step six, the ALJ found that Claimant had severe impairments because "[a]s of October 31, 2016, the claimant's impairments caused more than minimal limitation in the claimant's ability to perform basic work activities." (AR at 46.) The ALJ did not list which of Claimant's many impairments listed in 2013 were still severe. The ALJ did, however, find that Claimant's mental health impairments, including attention deficit disorder; polycystic ovarian disease; and obesity were now nonsevere impairments. (*Id.* at 41-43.) Specifically, the ALJ found that Claimant's ability to concentrate was only mildly limited because her mental status exam revealed normal concentration skills. (*Id.* at 43.) These findings left the following severe impairments: intracranial hypertension secondary to intracranial sinus thrombosis, partial visual field loss secondary to intracranial hypertension, papilledema, and a cerebral pseudotumor.[5]

_____

[5]"Intracranial" means "within the cranium." *Dorland's Illustrated Medical Dictionary* 953 (32d ed. 2012).
"Thrombosis" is "the formation, development, or presence of a thrombus," which is "a stationary blood clot along the wall of a blood vessel, frequently causing vascular obstruction." *Id.* at 1923.

At step seven, the ALJ found that Claimant had the following RFC as of October 31, 2016:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could stand, sit and walk for six hours in an eight hour workday; occasionally balance, stoop, kneel, crouch and crawl; she should avoid cannot [sic] climb ladders, scaffolds and ropes; avoid hazards, vibrations, extreme cold and heat, humid environments and excessive noisy work backgrounds at level 4 or 5.

(*Id.* at 43.) The ALJ also found that because Claimant had no past relevant work, transferability of skills was not an issue. (*Id.* at 46.)

Finally, at step eight, the ALJ found that Claimant was able to perform a significant number of jobs that exist in the national economy. (*Id.* at 47.) Therefore, Claimant's disability ended as of October 31, 2016. (*Id.*)

**B.** **The Substantial Evidence Standard**

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot

---

"Papilledema" is "edema of the optic disk (papilla), most commonly due to increased intracranial pressure, malignant hypertension, or thrombosis of the central retinal vein." *Id.* at 1372.

A "pseudotumor" is "an enlargement that resembles a tumor; it may result from inflammation, accumulation of fluid, or other causes, and may or may not regress spontaneously." *Id.* at 1546.

10

reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

### C. Duty to Develop the Record

The administrative hearing is a non-adversarial proceeding, and the ALJ has a duty to "fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Because the ALJ has no interest in denying Social Security benefits, the ALJ must act neutrally in developing the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971)); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994) (opining that "[t]he goals of the [ALJ] and the advocates should be the same: that deserving claimants who apply for benefits receive justice") (quoting *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988)) (bracketed information added).

### III. DISCUSSION

Claimant alleges (A) the ALJ incorrectly decided that Claimant's subjective complaints were not credible, (B) there is "a complete lack of medical evidence" showing that Claimant's disability has ended and the ALJ substituted her own medical opinion for

that of Claimant's treating physicians, and (C) the ALJ posited a hypothetical to the VE that was not supported by substantial evidence in the record. (Doc. 13 at 1.)

## A. The ALJ correctly decided that Claimant's subjective complaints were not credible.

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[6] An ALJ is not required to "methodically" discuss each *Polaski* factor as long as the ALJ "acknowledge[es] and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater,* 87 F.3d 963, 966 (8th Cir. 1996)).

---

[6] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

In this case, the ALJ found at the first step that "the claimant's medically determinable impairments could have reasonably been expected to produce some but not all the alleged symptoms and severity." (AR at 44.) At the second step, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (*Id.*) To support this determination, the ALJ stated that Claimant's neurologist, Dr. Case, and neuro-ophthalmologist, Dr. Thurtell, noted mostly normal and stable exam results in 2016 and 2017 and noted that Claimant's medications "adequately control her headaches." (*Id.* at 44-45.) The ALJ also noted that in 2011, Claimant was eligible for vocational rehabilitation services, worked part time at Walmart in 2010, 2011, and 2012, and very briefly at Tip Top Tux.[7] (*Id.* at 42, 45.) The ALJ also stated that Claimant described daily activities "which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.*) The ALJ cited Claimant's ability to work and seek out employment, take care of "all her activities of daily living and help her mother with chores," shop, craft, and drive. (*Id.*) The ALJ opined that "the ability to drive demonstrates concentration and persistence as well as an ability to

---

[7] Claimant also worked at Siouxland Radiology, her mother's employer, on an on-call, part-time basis for about five years. (AR at 64-65.)

deal with the stress inherent in the operation of a motor vehicle. The ability to drive also shows a good degree of concentration and persistence; attributes necessary to work effectively." (*Id.*)

The ALJ further reasoned that Claimant "seeks and attends very little treatment" and "that the record does not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians, indicating that the claimant is disabled." (*Id.*) The ALJ also noted that Claimant did not exhibit any "debilitating symptoms while testifying at the hearing." (*Id.*) While admitting that such evidence "cannot be considered a conclusive indicator of the claimant's overall level of functioning on a day-to-day basis, the apparent lack of debilitating symptoms during the hearing is a permissible factor to consider amongst other factors in determining claimant's allegations and the claimant's [RFC]." (*Id.*) The ALJ concluded, "[t]he objective medical evidence, showing rather routine and conservative management of the claimant's conditions, and mostly mild imaging and clinical findings, simply does not establish physiological abnormalities, which would limit the claimant's daily activities to the debilitating degree alleged or preclude the claimant from performing at the [assigned RFC]." (*Id.* at 46.)

"The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to its judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (citation omitted). Here, "[a]lthough the ALJ did not go through a step-by-step factors analysis, she did discuss the facts relevant to a proper inquiry into each of the factors." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011). Unhelpfully, Claimant's arguments do not follow the

*Polaski* analysis. I have categorized her arguments within the framework in the way that seems the most reasonable.

### 1. The ALJ properly acknowledged and examined the objective medical evidence.

When considering the objective medical evidence in the record, the ALJ recognized that "the medically determinable impairments could reasonably be expected to produce some but not all of the alleged symptoms and severity." (AR at 44.) The ALJ also noted, however, that Claimant's statements concerning "the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC. (*Id.*) In relevant part, the ALJ discussed Dr. Case's and Dr. Thurtell's treatment notes.[8]

Claimant's only argument related to this factor is that the ALJ stated that "the opinions of the doctors are conclusory opinions. The longitudinal medical records demonstrate Plaintiff's symptoms." (Doc. 13 at 7) (internal citations omitted.) Claimant cites nothing in the "longitudinal medical records"[9] that contradicts the ALJ's conclusion that the treatment notes of Drs. Case and Thurtell do not support Claimant's continued disability. Accordingly, I see nothing to support this factor. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting "out of hand" a claimant's assertions because the claimant provided "no analysis of the relevant law or facts"); *Scott v. Astrue*, No. CIV. 5:07-CV-05168, 2008 WL 4183396, at *7 (W.D. Ark. Sept. 11,

---

[8] The ALJ also discussed the treatment notes and opinions of Michael Baker, Ph.D. and Scott Shafer, Ph.D. related to Claimant's mental impairments and medical records related to Claimant's polycystic ovary disease and obesity. (AR at 42-43.) However, Claimant is not appealing the ALJ's decision that these impairments are no longer severe. Therefore, the ALJ's evaluation of these records is not relevant to the *Polaski* analysis.

[9] Claimant's argument ignores the obvious point of a cessation of benefits case; i.e., to determine if there has been a change from what is shown in the "longitudinal medical records."

2008) ("Because Plaintiff has not provided any briefing to support her claim, this Court is not required to address this argument.") (citing *Vandenboom*, 421 F.3d at 750); *Adams v. Astrue*, No. CIV. 4:07-CV-04030, 2007 WL 4557803, at *4 (W.D. Ark. Dec. 20, 2007) ("[B]ecause Plaintiff provided no facts or law to support these arguments and has provided this court with no basis from which to analyze his claims, this Court is not required to address, and will not address, these three arguments directly in this opinion.").

The only opinion the ALJ refers to is Dr. Case's September 1, 2016 letter, which is conclusory because it contains no citations to medical evidence or treatment notes and contains no functional limitations. "The better an explanation a source provides for a medical opinion, the more weight [the ALJ] will give that medical opinion." 20 C.F.R. § 404.1527(c)(3); *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (holding that doctor's opinions "possess[ed] little evidentiary value" because they cited "no medical evidence and provide[d] little to no elaboration"). The letter merely restates information Claimant relayed to Dr. Case. The ALJ also noted this lack of support for Claimant's claims. (AR at 45.) It is not the Court's role to find support for her case in the "longitudinal records."

In conclusion, I find that the ALJ properly acknowledged and examined the objective medical evidence in the record as it related to Claimant's subjective complaints.

### 2. *The ALJ properly acknowledged and examined Claimant's Daily Activities.*

The ALJ also reviewed Claimant's daily activities to evaluate her subjective complaints. Claimant takes issue with the ALJ's finding that she can "shop, drive, and do crafts" on a limited basis, which Claimant argues does "not show she can lift 20 pounds occasionally, 10 pounds frequently, stand 6 hours out of an 8 hour day, as all required by light work." (Doc. 13 at 6-7.)

In her Adult Function Report, Claimant told the SSA that she could drive; ride a bike; reheat leftovers in the microwave and make sandwiches and ramen noodles daily; clean her bedroom weekly; feed and water the cats daily, with reminders from her mother. (AR at 315-18.) For hobbies, Claimant visits her grandparents, reads, crochets, paints, makes jewelry, and plays video games. (*Id.* at 317.) Claimant shops for food weekly, but shops quickly because of the lights. (*Id.* at 316.) She attends barbeques about once every three months. (*Id.* at 70.) In her function report, Claimant also stated that she could lift 35 pounds and did not state that her conditions affected her ability to stand in response to a direct question. (*Id.* at 318.) In addition, in a face-to-face interview with an SSA employee on October 5, 2016, the interviewer noted that Claimant had no difficulties standing. (*Id.* at 328.)

While Claimant is correct that she need not prove she is bedridden before she qualifies for benefits, *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), Claimant must cite evidence to support her claims. Here, Claimant has cited no evidence to support her claim that she is unable to meet the lifting and standing requirements of light work. In addition, as will be discussed below, the ALJ found Claimant's "ability to perform all or substantially all of the requirements of [light unskilled] work had been impeded by additional limitations." (AR at 47.) To that end, the ALJ specifically asked the VE to provide examples of both light and sedentary jobs. (*Id.* at 83.) In her decision, the ALJ provided two examples of light category jobs and two examples of sedentary category jobs that incorporated the RFC limitations. (*Id.* at 43, 82-83.)

I find that the ALJ properly acknowledged and examined Claimant's daily activities as they relate to Claimant's subjective complaints.

### 3. The ALJ properly acknowledged and examined the dosage, effectiveness, and side effects of medications.

Claimant takes issue with the following reasons the ALJ discounted her subjective complaints: the Claimant "receives sporadic treatment for the alleged disabling impairment" and "the Plaintiff betrayed no evidence of debilitating symptoms while testifying at the hearing." (Doc. 13 at 7) (internal citations to ALJ decision omitted.)

Although Claimant stated that she has been seeing Dr. Case since she was 16-years-old (AR at 61), the record contains only one annual treatment note from Dr. Case for each of the following years: 2015, 2016, and 2017. (*Id.* at 391, 422, 508.) Therefore, the record contains only three treatment notes from Dr. Case. Claimant testified that she only sees Dr. Case once a year. (*Id.* at 70.) At the end of each treatment note, Dr. Case wrote, "[W]ill plan to see Lydia back in one year, barring interval difficulties," or something similar that made it clear he was willing to see Claimant at any time. (*e.g., id.* at 509.) Between April 2015 and April 2017, Claimant apparently never had any "interval difficulties" because she never saw Dr. Case between annual appointments.

In fact, there is no evidence in the record that Claimant sought any medical treatment for her headaches except for her annual appointments with Dr. Case and her 2016 neuro-ophthalmology appointment with Dr. Thurtell. Claimant did mention going to the emergency room in the past for headaches and receiving Ketorolac and a Toradol injection, both of which she testified were ineffective and led her to "simply waiting the migraine out." (*Id.* at 71, 324.) At her December 19, 2012 disability hearing, however, Claimant testified that Toradol injections made her headaches go away. (*Id.* at 109.) There is no indication that Claimant discussed emergency room visits or any "failed medications" with Dr. Case. Dr. Thurtell also indicated that he was available between yearly appointments to address questions and concerns. (*Id.* at 439.) Thus, the record indicates that Claimant has employed only conservative and infrequent treatment for her

headaches and has not sought further medical intervention, instead deciding on her own that treatment will be unsuccessful, when no physician has stated that Claimant has exhausted all the medications or treatments the medical community has to offer. In fact, in April 2017, Dr. Case gave Claimant literature on Botox for migraine, a therapy she had not yet tried. (*Id.* at 509.)

Claimant argues that she has not sought treatment because "nothing . . . can be done to cure her situation. She can only treat the symptoms." (Doc. 13 at 7.) First, a cure is not required in order for Claimant to be employable. A claimant's RFC is what she can still do despite her limitations. *Guilliams*, 393 F.3d at 801. Second, Claimant's two allegedly-less-than-satisfactory trips to the emergency room undermine Claimant's allegations of disabling headache pain, especially when she has long-term treatment relationships with two specialists who are willing to address her concerns at any time. *See McClees v. Shalala*, 2 F.3d 301, 303 (8th Cir. 1993) (holding that the ALJ properly considered the claimant's failure to seek treatment in discrediting subjective complaints of pain). Moreover, there are obviously treatments Claimant has not tried as evidenced by Dr. Case's offer of Botox treatments at Claimant's April 2017 appointment (AR at 509) and Claimant could limit her worst headache days by increasing her medication compliance.[10] (*Id.* at 435) (Dr. Thurtell stated that Claimant's symptoms are "definitely worse" when she skips her medications.) Therefore, the ALJ's conclusion that Claimant seeks only sporadic treatment is supported by the record as a whole.

---

[10] In his argument on this issue, the Commissioner cites a treatment note dated January 31, 2018. (Doc. 14 at 16.) This treatment note is part of the evidence Claimant submitted to the Appeals Council with her request for reconsideration. (AR at 12-26.) The Appeals Council determined that these records, all dated after the date the ALJ issued her decision in this case, were "not relevant to the period at issue," and therefore the Appeals Council did not consider these records. (*Id.* at 2.) Accordingly, these records are not part of the administrative record and I have not considered them when making my recommendations.

Claimant cites *Muncy v. Apfel*, 247 F.3d 728, 735 (8th Cir. 2001) for the proposition that the ALJ's comment on Claimant's demeanor during the hearing on this matter "cannot be dispositive of [the Claimant's] credibility." (Doc. 13 at 7.) The ALJ acknowledged that this evidence could not be considered "a conclusive indicator of the claimant's overall level of functioning on a day-to-day basis," but stated that Claimant's lack of debilitating symptoms at the hearing could be considered among other factors when determining Claimant's RFC. (AR at 45.) The ALJ was correct. *See Andrews v. Colvin*, 791 F.3d 923, 929 (8th Cir. 2015). More importantly, the ALJ cited several supporting reasons for discounting Claimant's credibility, including her daily activities, her conservative and infrequent treatments, and the fact that medications were relatively successful. (AR at 44-46.) The ALJ could properly consider Claimant's demeanor at the hearing as one piece of evidence when evaluating Claimant's credibility. *Andrews*, 791 F.3d at 929. Therefore, this argument is without merit. Accordingly, I find that the ALJ properly acknowledged and explained the dosage, effectiveness, and side effects of medications as they relate to Claimant's subjective complaints.[11]

### 4. Conclusion

In conclusion, I find that the ALJ properly evaluated Claimant's subjective complaints and articulated good reasons for discrediting Claimant's testimony and self-reports, including her self-reports to physicians. *See Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (holding that the court will "normally defer to the ALJ's credibility determination" if the ALJ "explicitly discredits the claimant's testimony and gives good reasons for doing so"). Accordingly, I find that substantial evidence on the record as a

---

[11] Although the parties do not proffer arguments related to factors 2, 3, and 5, I find that the ALJ properly acknowledged and examined those factors as much as they relate to Claimant's subjective complaints.

whole supports the ALJ's credibility determination and recommend that the district court affirm the ALJ's decision on this issue.

**B.**  ***Medical evidence supports the ALJ's finding that Claimant's disability ended on October 31, 2016.***

A claimant is no longer entitled to benefits if substantial evidence demonstrates the following.

> [O]n the basis of new or improved diagnostic techniques or evaluations, the individual's impairment or combination of impairments is not as disabling as it was considered to be at the time of the most recent prior decision that he or she was under a disability or continued to be under a disability, and that therefore the individual is able to engage in substantial gainful activity.

42 U.S.C. § 423(f)(3). Claimant argues that there is a "complete lack of medical evidence" in the ALJ's decision supporting her conclusion that Claimant's disabilities ended because there is no cure for Claimant's intracranial sinus thrombosis, intracranial hypertension, or cerebral pseudotumor.   (Doc. 13 at 4.)  The absence of a "cure" is not the standard.

"Medical improvement 'is determined by a comparison of prior and current medical evidence.'" *Delph*, 538 F.3d at 947 (quoting 20 C.F.R. § 404.1594(c)(1)). Under SSA regulations, medical improvement is "[A]ny decrease in the medical severity of . . . impairment(s) [that were] present at the time of the [CPD]." *Id.* (citing 20 C.F.R. § 416.994(b)(1)(i)).

Claimant was originally found disabled due to the need to have excessive absences from work.  (AR at 172-73.)  Except for the record of the administrative hearing, the evidence the ALJ relied on in 2013 is not part of the current record.  It appears that  Dr. Case, Claimant's current neurologist, wrote a letter in support of finding Claimant disabled at that time.  In that letter, Dr. Case noted that Claimant "has not been successful in attending college or working in fully gainful employment" and that he "fully supports her application for disability."  (*Id.* at 172.)  At that time, the ALJ included in the RFC

that Claimant would have to be absent from work two or three days a month. (*Id.* at 171.) Based on this limitation, the VE testified that there were no jobs in the national economy that Claimant could do. (*Id.* at 173.)

Claimant asserts that the medical evidence in the record supports a finding that she is still disabled. Specifically, Claimant notes that she has been "continually treated by neurologist, Dr. James Case, for her residual visual disturbances and chronic headaches, . . . the same severe impairments as when she was initially awarded benefits. To wit: intracranial hypertension secondary to intracranial sinus thrombosis." (Doc. 13 at 4-5.) In addition, Claimant argues that Dr. Case "is supportive of her disability" and that she also treats with a specialist at the University of Iowa Hospitals and University of Nebraska Medical Center.[12] (*Id.* at 5-6.) Claimant avers that the ALJ "did not cite any medical authority to contradict these doctors' opinions." (*Id.* at 6.) In doing so, Claimant asserts that the ALJ substituted her opinion for that of Claimant's treating physicians and missed the "a. Severity of [Claimant's] illness [and] b. Lack of any cure." (*Id.* at 5.)

Claimant also avers that her past attempts to work "on a very limited, part time basis" failed due to poor attendance necessitated by her impairments, which proves she is unable to engage in substantial gainful employment. (*Id.* at 4.)[13]

---

[12] The records from the University of Nebraska were submitted with Claimant's appeal. The Appeals Council found them to be outside the relevant time period. (AR at 2.) As discussed in footnote 10, I have not considered these records in making my recommendations.

[13] Claimant makes arguments only related to her intracranial sinus thrombosis, intracranial hypertension, and cerebral pseudotumor. The physicians' opinions and treatment notes that she cites for support are from physicians she has seen for treatment of these conditions. Therefore, I find that Claimant has waived any arguments related to the other disabilities she had at the time of the March 19, 2013 CPD. *See Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010) (noting that district court opined that although the claimant "discussed the Record at some length, he has not alleged any of the ALJ's findings regarding his physical capabilities or the effects of depression were erroneous" and holding that any arguments not properly raised at the district court level are waived on appeal) (citing *Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Novotny v. Chater*, 72 F.3d 669, 670 (8th Cir.1995)).

Dr. Case wrote a letter to the SSA that, in relevant part, states the following:

> Lydia Buckley is under my ongoing care for the following neurologic diagnoses:
> 1. Intracranial hypertension secondary to intracranial sinus thrombosis. . . . but continues to require medication management for refractory headaches.
> 2. Partial visual field loss as a sequela of intracranial hypertension.
>
> .   .   .
>
> Over my years caring for Lydia, I have watched this young lady attempt college, then gainful employment. As a consequence of her multiple diagnoses, she has not been successful in maintaining employment or school, despite positive motivation. I fully support her application for disability.

(*Id.* at 432.) The ALJ gave this opinion "very little weight" because it was a "general conclusory statement" and Dr. Case's treatment notes do not support this conclusion. (*Id.* at 46.) The ALJ also opined that Dr. Case's treatment notes show that Claimant's symptoms are controlled and that Claimant only visits him once-a-year. (*Id.*)

The Commissioner argues that there has been a decrease in the medical severity of Claimant's symptoms based on improvement in the symptoms, signs and/or laboratory findings associated with her impairments. For support, the Commissioner cites the opinions of state agency physician Matthew Byrnes, D.O., who stated that no disabling headaches are documented (AR at 145) and Dr. Thurtell, who documented 20/20 vision and full vision fields on December 14, 2016 (*Id.* at 516-20), which the Commissioner avers undermines Claimant's assertion that her headaches are linked to vision problems and intercranial pressure.

The Commissioner also argues that Claimant's daily activities are "more consistent with the ability to work than . . . with debilitating sensitivities and spending most of the day in bed." (Doc. 14 at 19.) The Commissioner also argues that evidence indicates

that her condition has stabilized and that she does not have the 15% vision reduction she testified she had. (AR at 74.)

I find that substantial evidence in the record as a whole supports the ALJ's decision on this issue, even though some evidence supports the opposite conclusion. *See Moore*, 572 F.3d at 522. The narrow issue before the ALJ was whether the recent evidence supports Claimant's ability to attend work on a full time basis. The ALJ's 2013 decision was based on absenteeism. There is no medical evidence in the current record stating that Claimant would miss work two-to-three days a month. The only indication that Claimant has three-day headaches are Claimant's self-reports. There are no clinical tests or medical records indicating that she has sought treatment for acute pain or migraine symptoms. Claimant has only sought treatment yearly for her regular medication and vision checks. While not dispositive, a "failure to seek medical treatment may be inconsistent with a finding of disability." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (finding that claimant sought medical treatment merely to obtain benefits rather than to obtain symptom relief). As discussed above, Claimant has at least one other treatment available to her that she apparently did not pursue in the two months between her last appointment with Dr. Case and the hearing on this matter. Moreover, Claimant did not avail herself of the expertise of Dr. Case and Dr. Thurtell between yearly appointments, even though they made themselves available to Claimant. In fact, in the years covered by the record, Claimant sought no treatment for headaches between her yearly medication-check and eye-check visits.

In addition, Dr. Thurtell and Dr. Case both state that Claimant's condition has stabilized. (*Id.* at 422 ("She was felt to be stable with no findings to suggest raised intracranial pressure."); 435 ("[T]hings are stable from last year. Her vision is worse in the right eye than the left eye but this is unchanged."); 437 (20/20-2 and 20/20 base eye exam); 509 (20/30 and 20/20 visual acuity near card uncorrected).)

Furthermore, Claimant testified that in spite of waking up every morning with some kind of headache pain, the pain will often get down to a manageable level within an hour of waking if she eats and is "active in some way." (*Id.* at 72.) Claimant reads for hours every day (*Id.* at 317, 429) and types stories for hours a day, sometimes typing six-to-ten single-spaced pages in one day (*Id.* at 429). As the state hearing officer stated, "[T]he fact that when she has headaches she does such activities as reading and writing quite often . . . would indicate that she could do those activities in a vocational setting." (*Id.* at 201.)

Claimant seems to be arguing that she must have complete relief from her headaches to possess the ability to work. That is not the standard. The ALJ was required to determine only if Claimant's condition had improved and if that improvement was related to her ability to work. 20 C.F.R. § 404.1594(f)(6). The ALJ did so. Claimant is able to engage in many activities in spite of her headaches, and some of those activities are vocational in nature. Claimant has treatment options available to her, but has decided on her own not to pursue treatment between medication checks. It may well be that Claimant is still disabled, but the record before the Court does not support this. Although the Commissioner has the burden to establish that Claimant is not disabled, Claimant has the burden to provide her medical records and other documents to support her arguments. She has not done so.

Finally, contrary to Claimant's argument, I find that the ALJ did not inappropriately assume the role of doctor when she "missed" the severity of Claimant's illness and lack of any cure for the impairments that cause Claimant's headaches. Rather, the ALJ reviewed "all the evidence [in] the record" and "follow[ed] the specific steps in reviewing the question of whether [Claimant'] disability continue[d]." (*Id.* at 39; 20 C.F.R. § 404.1549(f)). The fact that the ALJ looked at the record and came to a different conclusion from Claimant does not mean that she took on an inappropriate role.

25

In *Pate-Fires v. Astrue*, the claimant had a long history of severe mental health issues. 564 F.3d 935, 937-41 (8th Cir. 2009). The Eighth Circuit reversed a district court's denial of benefits and reasoned that not only did the evidence "overwhelmingly" demonstrate that the claimant's medical noncompliance was due to mental health issues, but also that the ALJ's determination that the claimant's noncompliance was "attributable to free will [was] tantamount to the ALJ 'playing doctor,' a practice forbidden by law." *Id.* at 946-47 (quoting *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996)). The ALJ in the case at bar did not commit such an error. She merely gave more weight to different evidence in the record than Claimant would (i.e., different activities of daily living, different statements from various treatment notes).

Therefore, based on the record as a whole, I recommend the District Court affirm the ALJ's decision on this issue.

## C.   *The ALJ did not rely on a defective hypothetical.*

Claimant lastly argues that the ALJ relied upon a defective hypothetical. The ALJ must assess the claimant's RFC and the demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 404.1520(a)(4)(iv). If the claimant can still perform her past relevant work, the claimant is not disabled. *Id.* To assist in this determination, "a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work." *Id.* at § 404.1560(b)(2).

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) (quotation omitted). "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Id.* "The hypothetical question must capture the concrete consequences

of the claimant's deficiencies" but "may exclude any alleged impairments that [the ALJ] has properly rejected as untrue or unsubstantiated." *Perkins*, 648 F.3d at 901-02 (quotations omitted).

At the hearing, the ALJ posed one hypothetical to VE Stephen Schill. (AR at 82.) The hypothetical assumed a person with the following RFC:

> an individual who can occasionally lift or carry 20 pounds, frequently lift, or carry 10 pounds, stand, sit, or walk for six hours in an eight-hour day, can occasionally do all postural activities; climb, balance, stoop, kneel, crouch, crawl. Should avoid working with hazards such as dangerous machinery or heights, also avoid vibrating equipment as well as concentrated exposure to cold, heat, humidity, and noise. So, I think noise is rated on a 1 to 5 scale, so I would say not jobs at 3, or 4, or 5 which are considered very noisy, or extremely noisy. So, with that functional capacity can you identify any light or sedentary work that would be retained, and if so, could you give the jobs . . . and the number of jobs.

(*Id.*) The VE testified that a person with these limitations would be working in the "unskilled light" category, and that the following jobs are available: mail clerk and sorter. (*Id.*) The VE also testified that appropriate unskilled sedentary jobs for this person would be addresser and polisher of eye frames.[14] (*Id.* at 83.) The following exchange then took place between the VE and Claimant's attorney:

> Attorney: If this individual were to have to miss work three times a month because of headaches, would they be able to be employed in any of those jobs?
>
> VE: No, there would not—she would not be able to be competitively employed.
>
> Attorney: If the individual could sit for about two to three hours and after that they had to lay down for more than half an hour, would they be able to do those jobs?
>
> VE: No, they wouldn't. And if they would, it would be an accommodation.

___

[14] The VE testified there are 45,000 mail clerk jobs; 75,000 sorter jobs; 16,000 addresser jobs; and 19,000 polisher of eye frame jobs in the national economy. (AR at 83.) I find these to be significant numbers of jobs.

| Attorney: | Okay, the jobs you all talked about have a certain productivity requirement, even though it's not set by a set number probably, but you have to be able to perform the job when you're there, right? |
|---|---|
| VE: | That is correct. |
| Attorney: | And if you're distracted because of a headache or unable to function and do the job you can't—you're not able to perform those jobs, is that correct? |
| VE: | Well, you'd have to give me a percentage of her day . . . that she'd be distracted. |
| Attorney: | Okay, if she'd be distracted, say, 20 percent of the time, could she do these jobs? |
| VE: | No, they would not be able to. |
| Attorney: | If she were distracted 10 percent of the time, could she do those jobs? |
| VE: | Probably not, no. |

(*Id.* at 84-85.) The ALJ concluded that Claimant had no past relevant work, that she has at least a high school education and is able to communicate in English, and that transferability of skills is not an issue. (*Id.* at 46.) The ALJ also concluded that Claimant can perform work that exists in significant numbers in the national economy. (*Id.* at 47.) Specifically, the ALJ determined that Claimant can now perform the jobs of mail clerk, sorter, addresser, and polisher of eye frames and is therefore is no longer disabled. (*Id.*)

Claimant argues that the RFC fails to include the following limitation from the parties' stipulated statement of facts: "Plaintiff's intracranial hypertension secondary to varicose sinus thrombosis resulting in optic atrophy with visual field deficiencies and chronic daily headaches." (Doc. 13 at 9) (citing Doc. 12 at 7-8.) Claimant also avers that the RFC failed to include the following limitations: Claimant's need for more frequent breaks than normal, to miss work three days-a-month due to health problems, and tendency to be off task ten percent of the time when she is at work. (*Id.*) According to Claimant, because the VE testified that being off task and missing work at these rates would eliminate all jobs, Claimant is unemployable.

First, the medical evidence referred to at Doc. 12 in Claimant's brief is a record Claimant submitted to the Appeals Council with her appeal from the ALJ's decision. (*Id.* at 1-36.) I have already found that this information is irrelevant because it does not relate to the time period at issue and because it was not part of the record before the ALJ. For the reasons articulated in footnote 10, I have not considered this evidence. In addition, the stipulation of facts is just that—a stipulation that the words on the page correctly reproduce certain information from the cited documents. Furthermore, as the Commissioner notes, in context, the cited treatment notes do not support Claimant's arguments; they actually support the Commissioner. (Doc. 14 at 16.)

Second, as to the substance of Claimant's argument, no physician opined that Claimant would be off task ten percent of the day or would miss work three-days-a-month. While Dr. Case does mention failed work and school placements, Claimant has not tried to participate in either of these activities since at least her CPD date in 2013, so that basis for his opinion is not within the relevant time period. To the extent Claimant is arguing that because her medical condition is unchanged, working would be futile, I find that argument without merit. As discussed below, I find the ALJ's RFC supported by substantial evidence in the record as a whole, which means I do not find that Claimant will fail if she works in a position that is appropriate for her skill level and limitations. To that end, I note that except for the job at Siouxland Radiology with her mother, Claimant has only worked in the retail industry, which may have given Claimant a narrow view of what is available to her for employment.

Third, the Commissioner does not argue that Claimant does not have daily headaches, as Claimant apparently views the Commissioner's position. Rather, the Commissioner argues that there is no medical evidence to support Claimant's assertion that she is incapable of working with proper limitations. I agree. Dr. Byrnes, who reviewed the record for the state agency, could not find any physical reason why Claimant

"would be missing work on a regular basis." (*Id.* at 145.) Dr. Thurtell's treatment note states that "things are stable from last year," Claimant does not have consistently raised intracranial pressure, and that Claimant's headaches are worse if she misses a dose of her medication. (*Id.* at 435-38.) Importantly, Dr. Thurtell did not place any limitations on Claimant's activities. The ALJ found Claimant's ability to concentrate only mildly limited because her objective mental status exam revealed normal concentration skills.[15] (*Id.* at 43, 430.) Even Dr. Case did not specify what types of vocational limitations Claimant needed or in what ways Claimant's headaches affected her life other than to write down things that Claimant had reported to him. Claimant engages in full days of activities such as hours of reading and typing. As discussed above, the only evidence of Claimant's three-day headaches are her self-reports and, also discussed above, the ALJ properly evaluated the record as a whole and determined that this impairment was not supported. In addition, Claimant testified her headaches often subside after an hour if she eats and is active (*Id.* at 72) and many of the activities Claimant does for hours daily, such as reading and typing, are activities that can translate well to a work setting.

The ALJ's task was to decide what work Claimant could do in spite of her limitations. *Id.* at § 404.1594(f)(8). The ALJ was not required to include the properly rejected alleged impairments in the hypothetical. *See Prosch v. Apfel*, 201 F.3d 1010, 1015 (8th Cir. 2000) (holding that the ALJ was not required to include in the hypothetical impairments from a doctor's opinion that the ALJ properly rejected). In addition, the ALJ also properly evaluated Claimant's credibility and found her to be not entirely credible. The ALJ was only required to include in the hypothetical impairments the ALJ found supported by the record. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001).

---

[15] Dr. Baker described Claimant's concentration as "good." (AR at 430.)

The ALJ included in the hypothetical "all impairments that were accepted by the ALJ as true and excluded other alleged impairments that the ALJ had reason to discredit." *Pearsall v. Massanari*, 274 F.3d 1211, 1220 (8th Cir. 2001) (citation omitted). Therefore, the testimony of the VE constitutes substantial evidence and the ALJ did not rely on a defective hypothetical.

Under our deferential standard of review, I find that substantial evidence on the record as a whole demonstrates that Claimant can perform light duty unskilled work and that the ALJ did not rely on a defective hypothetical. Accordingly, I recommend that the District Court affirm the ALJ's decision on this issue.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm the decision of the ALJ** and **dismiss Plaintiff's case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 8th day of August, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa